**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

<table>
<tr>
<td>
SAN LUIS & DELTA-MENDOTA WATER AUTHORITY; WESTLANDS WATER DISTRICT,<br>
<em>Plaintiffs-Appellees</em>,
<br><br>
v.
<br>
KEVIN HAUGRUD,<sup>*</sup> as Acting Secretary of the U.S. Department of the Interior; U.S. DEPARTMENT OF THE INTERIOR; U.S. BUREAU OF RECLAMATION; DAVID MURILLO, as Acting Commissioner, Bureau of Reclamation, U.S. Department of the Interior; DAVID MURILLO, as Regional Director, Mid-Pacific Region, Bureau of Reclamation, U.S. Department of the Interior,<br>
<em>Defendants</em>,
<br><br>
PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS;
</td>
<td>
No. 14-17493<br><br>
D.C. No.<br>
1:13-cv-01232-LJO-GSA
</td>
</tr>
</table>

---

[*] Kevin Haugrud and David Murillo are substituted for their predecessors, Sally Jewell and Michael L. Connor, as Acting Secretary of the U.S. Department of the Interior and Acting Commissioner, Bureau of Reclamation, pursuant to Fed. R. App. P. 42(c)(2).

INSTITUTE FOR FISHERIES
RESOURCES; YUROK TRIBE,
          *Intervenor-Defendants*,

and

HOOPA VALLEY TRIBE,
          *Intervenor-Defendant-Appellant.*

SAN LUIS & DELTA-MENDOTA
WATER AUTHORITY; WESTLANDS
WATER DISTRICT,
          *Plaintiffs-Appellees*,

v.

KEVIN HAUGRUD, as Acting
Secretary of the U.S. Department of
the Interior; U.S. DEPARTMENT OF
THE INTERIOR; U.S. BUREAU OF
RECLAMATION; DAVID MURILLO, as
Acting Commissioner, Bureau of
Reclamation, U.S. Department of the
Interior; DAVID MURILLO, as
Regional Director, Mid-Pacific
Region, Bureau of Reclamation, U.S.
Department of the Interior,
          *Defendants-Appellants*,

and

No. 14-17506

D.C. No.
1:13-cv-01232-
LJO-GSA

HOOPA VALLEY TRIBE; PACIFIC
COAST FEDERATION OF FISHERMEN'S
ASSOCIATIONS; INSTITUTE FOR
FISHERIES RESOURCES; YUROK
TRIBE,
*Intervenor-Defendants.*

---

SAN LUIS & DELTA-MENDOTA
WATER AUTHORITY; WESTLANDS
WATER DISTRICT,
*Plaintiffs-Appellees*,

v.

KEVIN HAUGRUD, as Acting
Secretary of the U.S. Department of
the Interior; U.S. DEPARTMENT OF
THE INTERIOR; U.S. BUREAU OF
RECLAMATION; DAVID MURILLO, as
Acting Commissioner, Bureau of
Reclamation, U.S. Department of the
Interior; DAVID MURILLO, as
Regional Director, Mid-Pacific
Region, Bureau of Reclamation, U.S.
Department of the Interior,
*Defendants*,

HOOPA VALLEY TRIBE; PACIFIC
COAST FEDERATION OF FISHERMEN'S
ASSOCIATIONS; INSTITUTE FOR
FISHERIES RESOURCES,
*Intervenor-Defendants*,

No. 14-17515

D.C. No.
1:13-cv-01232-
LJO-GSA

and

YUROK TRIBE,
    *Intervenor-Defendant-Appellant.*

SAN LUIS & DELTA-MENDOTA
WATER AUTHORITY; WESTLANDS
WATER DISTRICT,
                *Plaintiffs-Appellants*,

            v.

KEVIN HAUGRUD, as Acting
Secretary of the U.S. Department of
the Interior; U.S. DEPARTMENT OF
THE INTERIOR; U.S. BUREAU OF
RECLAMATION; DAVID MURILLO, as
Acting Commissioner, Bureau of
Reclamation, U.S. Department of the
Interior; DAVID MURILLO, as
Regional Director, Mid-Pacific
Region, Bureau of Reclamation, U.S.
Department of the Interior,
                *Defendants-Appellees*,

HOOPA VALLEY TRIBE; YUROK
TRIBE; PACIFIC COAST FEDERATION
OF FISHERMEN'S ASSOCIATIONS;
INSTITUTE FOR FISHERIES
RESOURCES,
    *Intervenor-Defendants-Appellees*.

No. 14-17539

D.C. No.
1:13-cv-01232-
LJO-GSA

OPINION

Appeal from the United States District Court
for the Eastern District of California
Lawrence J. O'Neill, Chief Judge, Presiding

Argued and Submitted December 12, 2016
San Francisco, California

Filed February 21, 2017

Before: Alex Kozinski and N. Randy Smith, Circuit Judges,
and Sharon L. Gleason,[**] District Judge.

Opinion by Judge N.R. Smith

**SUMMARY**[***]

**Environmental Law / Water Rights**

The panel affirmed in part and reversed in part the district court's judgment, and held that the Bureau of Reclamation had the authority to implement the 2013 release of Trinity River water from the Lewiston Dam, above and beyond the amount designated in the applicable water release schedule.

Reversing the district court, the panel held that the Act of August 12, 1955, gave the Bureau the authority to implement

[**] The Honorable Sharon L. Gleason, United States District Judge for the District of Alaska, sitting by designation.

[***] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

the 2013 flow augmentation release to protect fish in the lower Klamath River. Affirming the district court, the panel also held that the 2013 flow augmentation release did not violate Central Valley Project Improvement Act ("CVPIA") section 3406(b)(23), which called for a permanent water release that would serve only the Trinity River basin. The panel further held that the 2013 flow augmentation release did not violate California water law and, in turn, did not violate the Reclamation Act of 1902 or CVPIA section 3411(a), both of which require the Bureau to comply with state water permitting requirements.

The panel did not reach the merits of an Endangered Species Act claim because the plaintiff water contractors did not have standing to pursue that claim. The panel held that the water contractors lacked standing because they did not demonstrate that the Bureau's alleged failure to conduct a Section 7 consultation for Endangered Species Act-listed fish species would threaten their economic interests.

## COUNSEL

Daniel J. O'Hanlon (argued), Rebecca R. Akroyd, and Elizabeth L. Leeper, Kronick Moskovitz Tiedemann & Girard, Sacramento, California; Steven O. Sims and Dulcinea Z. Hanuschak, Brownstein Hyatt Farber Schreck LLP, Denver, Colorado; for Plaintiffs-Appellees/Cross-Appellants San Luis & Delta-Mendota Water Authority and Westlands Water District.

Ellen J. Durkee (argued), Bradley H. Oliphant, and Anna K. Stimmel, Attorneys; John C. Cruden, Assistant Attorney General; Environment and Natural Resources Division,

United States Department of Justice, Washington, D.C.; Stephen Palmer, Office of the Regional Solicitor, Department of the Interior, Sacramento, California; Carter Brown, Office of the Solicitor, Department of the Interior, Washington, D.C.; for Defendants-Appellants/Cross-Appellees Kevin Haugrud, U.S. Department of the Interior, U.S. Bureau of Reclamation, and David Murillo.

Thomas P. Schlosser (argued) and Thane D. Somerville, Morisset Schlosser Jozwiak & Somerville APC, Seattle, Washington, for Intervenor-Defendant-Appellant/Cross-Appellee Hoopa Valley Tribe.

Amy Cordalis and Nathan Voegeli, General Counsel, Yurok Tribe, Klamath, California; Daniel I.S.J. Rey-Bear, Nordhaus Law Firm LLP, Spokane, Washington; for Intervenor-Defendant-Appellant/Cross-Appellee Yurok Tribe.

## OPINION

N.R. SMITH, Circuit Judge:

In late summer 2013, the Bureau of Reclamation ("BOR") released Trinity River water from the Lewiston Dam, above and beyond the amount designated in the applicable water release schedule (a schedule that was devised to benefit only the Trinity River basin). That water flowed down the Trinity River and into the lower Klamath River, where winter-run salmon were beginning their migration upriver to their spawning grounds. BOR released the water to help prevent a mass die-off of these salmon in the lower Klamath, which are threatened when the Klamath River runs low. BOR asserted that the Act of August 12, 1955, ("1955 Act") gave

it the power to release this extra water. The 1955 Act "authorized and directed" the Secretary of the United States Department of the Interior ("DOI") "to adopt appropriate measures to insure the preservation and propagation of fish and wildlife." We agree with BOR. The broad language of this clause gave BOR the authority to implement the 2013 water release.

In implementing the 2013 water release, BOR also did not violate the Central Valley Project Improvement Act or California water law (and correspondingly the Reclamation Act of 1902, which requires agencies to comply with state water law), as alleged by Cross-Appellants San Luis & Delta-Mendota Water Authority and Westlands Water District. Finally, Cross-Appellants lack standing to pursue their Endangered Species Act claim.

BACKGROUND

I.

The Trinity River begins in the Trinity Alps of Northern California. The river runs south and then wends its way northwest, picking up tributaries along the way. It eventually flows into the Klamath River at the town of Weitchpec. The water then flows forty additional miles down the lower Klamath before entering the Pacific Ocean.

The Trinity River was once known for its abundant populations of salmon and steelhead. Before the construction of dams on the Trinity, up to 75,000 fall-run Chinook salmon are estimated to have migrated from the Pacific Ocean to the North Fork of the Trinity River each year. The Yurok and Hoopa Valley Indian Tribes (living along the Klamath and

Trinity Rivers) have relied on the fish as their primary dietary staple. In recognition of the Tribes' rights to harvest these fish, the federal government established reservations for the Tribes in the mid-1800s that endure to this day. The Trinity River bisects the Hoopa Valley Reservation, and the lower Klamath River bisects the Yurok Reservation.

At the same time, water management has always been a central concern for the state of California. For as long as it has been a state, California has adopted laws to manage its water resources. In the early 1920s, California began drafting a comprehensive, statewide water plan. California recognized that, while most of its water resources were located in the northern part of the state, the majority of the demand came from the state's southern regions. In addition, the population's demand for water did not align with the seasonal rainfalls and snow melt. With its statewide plan, California hoped to control salinity and flooding, while managing the storage and distribution of water. One of the primary goals of the plan was to transfer water from the Sacramento River to the San Joaquin Valley and from the San Joaquin River to the southern regions of the Central Valley, the heart of California's farmland. In 1933, the California Legislature authorized this statewide plan, known as the Central Valley Project ("CVP"). Because the state was unable to fully fund the plan, the United States took over in 1935. Construction of what would become the largest federally managed water project began in 1937. *See generally San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 594 (9th Cir. 2014); *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 943 (9th Cir. 2002); *United States v. State Water Res. Control Bd.*, 227 Cal. Rptr. 161, 166 (Cal. Ct. App. 1986); Eric A. Stene, *The Central Valley*

*Project*, BUREAU OF RECLAMATION (last updated Aug. 4, 2015), https://www.usbr.gov/history/cvpintro.html.

California's statewide water plan originally included plans to divert water from the Trinity River to the Central Valley. Although these initial plans were abandoned before the CVP was authorized, Congress began re-investigating the possibility in the 1940s. During this investigation, DOI estimated that more than 1.1 million acre-feet of water flowed from the upper Trinity River basin each year.[1] Reports suggested that only 120,500 acre-feet of water were needed to maintain the fishery resources of the Trinity and Lewiston Rivers. These reports also suggested that the construction of dams on the Trinity would actually help the fishery resources. Congress ultimately concluded that 700,000 acre-feet of the Trinity's annual flow was being lost to the Pacific Ocean and could be diverted to the Central Valley without harming the Trinity or lower Klamath Rivers. Accordingly, in 1955, Congress authorized the construction of the Trinity River division ("TRD"), an addition to the CVP in Northern California. Act of Aug. 12, 1955, Pub. L. No. 84-386 § 1, 69 Stat. 719, 719 (1955). The purpose of the TRD was to divert water from the Trinity River to the Sacramento River "for irrigation and other beneficial uses in the Central Valley." *Id.* Nevertheless, Congress designed the TRD "with a view to maintaining and improving fishery conditions," which were an important asset to "the whole north coastal area." H.R. Rep. No. 84-602, at 4 (1955). Accordingly, in

---

[1] An "acre-foot" is a unit of volume "equal to the amount of water it would take to fill an acre [of land] to a foot-deep level—approximately 326,000 gallons. An average household uses between one-half and one acre-foot of water in a year." *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 861 n.3 (9th Cir. 2004).

the 1955 Act, Congress specifically directed the Secretary of DOI to preserve and propagate fish and wildlife.  § 2, 69 Stat. at 719.

Under the authority granted by the 1955 Act, BOR constructed two dams along the Trinity River: the Trinity and the Lewiston.  The Trinity Dam blocks water flowing from the upper Trinity River, and several other tributaries, and forms Trinity Reservoir.[2]  After passing through Trinity Dam, water flows approximately eight miles downstream before reaching Lewiston Dam, which forms Lewiston Reservoir. At Lewiston Dam, the water either continues flowing down the Trinity River, or BOR diverts it toward the Sacramento River (via the Clear Creek Tunnel) for use in the CVP.  If diverted, the water passes through several additional dams before reaching the Sacramento River.  Water that is not diverted at the Lewiston Dam continues to flow down the Trinity River.  As it did before the dams were constructed, the water eventually passes through the Hoopa Valley Indian Reservation and into the Klamath River at the town of Weitchpec.  The water then flows forty miles down the lower Klamath and through the Yurok Indian Reservation until it reaches the Pacific Ocean.

The TRD became fully operational in 1964.  For the next ten years, BOR diverted an average of 88 percent of Trinity River annual inflow to the Sacramento River basin.

---

[2] This body of water has been referred to both as Trinity Lake and Trinity Reservoir.  Similarly, the body of water created by Lewiston Dam has been referred to both as Lewiston Lake and Lewiston Reservoir.

## II.

The construction and operation of the TRD had devastating effects on the Trinity River environment and fish populations. *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 862 (9th Cir. 2004). The dams blocked significant upstream fish habitat. *Id.* The low flows caused the Trinity River to narrow and the banks to steepen, resulting in increasingly fast and uniform water velocities. *Id.* These effects destroyed resting pools and vital spawning grounds. *Id.* Within a decade, the TRD had significantly diminished the salmon and steelhead populations in the Trinity River. *Id.* at 861–62.

### A. Trinity River Basin Fish and Wildlife Task Force

In response to the effects of the TRD, the Trinity River Basin Fish and Wildlife Task Force ("TRBFW Task Force" or "Task Force") formed in the early 1970s. The Task Force was comprised of federal, state, and local agencies. It studied the impact of the TRD and it worked to develop a plan for the long-term management of the fish population and habitat in the Trinity River basin.

### B. Secretarial Decision of 1981

In the late 1970s and early 1980s, in recognition and support of the Task Force, the Fish and Wildlife Service ("FWS"), the Bureau of Indian Affairs, and the Water and Power Resources Service studied the effects of increased water releases from the Lewiston Dam into the Trinity River. The agencies drafted an Environmental Impact Statement ("EIS") that considered eight alternative water release schedules. The agencies agreed that the best alternative was

to begin water releases from the Lewiston Dam at 287,000 acre-feet annually, and incrementally increase this flow to 340,000 acre-feet annually in normal years. BOR would release less water in dry years. The agencies also agreed to study and draft a report on the effect of restoration flows during the first twelve years of the revised flow releases ("Trinity River Flow Evaluation Study"). In 1981, then-Secretary of the Interior, Cecil Andrus, gave legal effect to this agreement in a Secretarial Decision.

### C. Trinity River Basin Fish and Wildlife Management Act of 1984

In 1984, Congress passed the Trinity River Basin Fish and Wildlife Management Act ("1984 Act"). Pub. L. No. 98-541, 98 Stat. 2721 (1984). The 1984 Act directed the Secretary to "formulate and implement a fish and wildlife management program for the Trinity River Basin designed to restore the fish and wildlife populations" to pre-TRD levels. *Id.* § 2, 98 Stat. at 2722. The 1984 Act also officially recognized the TRBFW Task Force. *Id.* § 3, 98 Stat. at 2722–23.

### D. Central Valley Project Improvement Act

In 1992, Congress enacted the Central Valley Project Improvement Act ("CVPIA"). Pub. L. No. 102-575 §§ 3401–12, 106 Stat. 4600, 4706–31 (1992). Among other things, the CVPIA sought "to protect, restore, and enhance fish, wildlife, and associated habitats in the Central Valley and Trinity River basins," while also seeking "to achieve a reasonable balance among competing demands for use of Central Valley Project water." *Id.* § 3402(a), (f), 106 Stat. at 4706.

Section 3406(b)(23) (at issue here), provided for water releases "to the Trinity River of not less than 340,000 acre-feet per year" from 1992 through 1996. 106 Stat. at 4720. It also directed DOI to "complete the Trinity River Flow Evaluation Study" (required by the 1981 Secretarial Decision) by September 30, 1996. *Id.* § 3406(b)(23)(A), 106 Stat. at 4720. DOI was to complete the study "in a manner which insures the development of recommendations, based on the best available scientific data, regarding permanent instream fishery flow requirements." *Id.* If the Secretary of the Interior and the Hoopa Valley Tribe agreed on the study's recommendations, then the recommendations were to "be implemented accordingly." *Id.* § 3406(b)(23)(B), 106 Stat. at 4720–21. "If the Hoopa Valley Tribe and the Secretary [did] not concur, the minimum Trinity River instream fishery releases established under [section 3406(b)(23) were to] remain in effect unless increased by an Act of Congress, appropriate judicial decree, or agreement between the Secretary and the Hoopa Valley Tribe." *Id.*

### E. Trinity River Basin Fish and Wildlife Management Reauthorization Act

In 1996, Congress enacted the Trinity River Basin Fish and Wildlife Management Reauthorization Act ("1996 Reauthorization Act"), which amended the 1984 Act and "extend[ed] for three years the availability of moneys for the restoration of fish and wildlife in the Trinity River." Trinity River Basin Fish and Wildlife Management Reauthorization Act of 1995, Pub. L. No. 104-143, 110 Stat. 1338, 1338 (1996). The 1984 Act had provided for "[t]he design, construction, operation, and maintenance of facilities to . . . rehabilitate fish habitats in the Trinity River between Lewiston Dam and Weitchpec." § 2(a)(1)(A), 98 Stat. at

2722. Among other things, the 1996 Reauthorization Act replaced "Weitchpec" with, "Weitchpec and in the Klamath River downstream of the confluence with the Trinity River." § 3(b), 110 Stat. at 1339.

## F. The 2000 Record of Decision

As directed by the 1981 Secretarial Decision and CVPIA section 3406(b)(23)(A), FWS biologists conducted flow evaluation studies annually from 1983 to 1994. In June of 1999, FWS and the Hoopa Valley Tribe released the Final Report for the Trinity River Flow Evaluation Study.[3] A few months later, BOR, the Hoopa Valley Tribe, FWS, and Trinity County issued a Draft Trinity River Mainstem Fishery Restoration Environmental Impact Statement/Report. The EIS "addresse[d] the environmental issues, alternatives, and impacts associated with restoration of the natural production of anadromous fish on the Trinity River mainstem downstream of Lewiston Dam." The EIS identified and analyzed four alternative actions and identified a "Preferred Alternative." In a Record of Decision ("2000 ROD"), DOI adopted the Preferred Alternative, finding it to be the "action which best meets the statutory and trust obligations [to the Hoopa Valley and Yurok Tribes] of the Department to restore and maintain the Trinity River's anadromous fishery resources."

Under the Preferred Alternative, BOR would, among other things, release a designated amount of water from the Lewiston Dam into the Trinity River each year, based on that

---

[3] FWS and the Hoopa Valley Tribe prepared the Final Report in consultation with the U.S. Geological Survey, BOR, National Marine Fisheries Service, and California Department of Fish and Game.

year's hydrology. This amount would range from 369,000 acre-feet in critically dry years to 815,000 acre-feet in extremely wet years.

## III.

In September 2002, two fish pathogens, Ich and Columnaris, caused approximately 34,000 fish to die in the Klamath River. These pathogens are normally present in the river, but a combination of factors caused the pathogens to proliferate and become lethal. The low river flow that year was not attractive to migrating adult salmon, so the salmon congregated in the warm waters of the lower Klamath River. The low flows, warm water temperatures, and high density of fish triggered an epizootic of Ich and Columnaris that spread throughout the fish population.

In April 2003, Judge Oliver Wanger of the Eastern District of California issued an order permitting BOR to release 50,000 additional acre-feet of water from the Lewiston Dam (above the annual instream flow release set by the 2000 ROD) to reduce the likelihood of a recurrence of the 2002 fish die-off. To ensure that this "flow augmentation release" would have no impact on the CVP water users, BOR entered into an agreement with the Metropolitan Water District of Los Angeles to exchange water from the Trinity Reservoir for non-CVP deliveries. In August 2003, BOR notified the Eastern District of California of its plan to release 33,000 acre-feet of water from the Lewiston Dam as a preventative measure, while holding the additional 17,000 acre-feet of water in case an emergency release was needed.

In 2004, BOR notified the Eastern District of California of its plan to release an additional 36,300 acre-feet of water

in late summer, again to prevent another fish die-off. BOR had 11,313 acre-feet of water left over from its 2003 exchange with the Metropolitan Water District of Los Angeles. BOR also purchased 25,000 acre-feet of water from willing sellers in the Sacramento River Water Contractors Association to cover the remaining water needed for the 2004 flow augmentation release.

Over the next eight years, conditions improved such that BOR did not find it necessary to augment the river flow. Then, in 2012, BOR predicted that the fall-run of adult salmon in the Klamath basin would be incredibly large (the largest since it began keeping records in 1978), while the flows in the Klamath River would be relatively low. Accordingly, in order to prevent another potential fish die-off, BOR studied and proposed a flow augmentation release of an additional 48,000 acre-feet from the Lewiston Dam. BOR drafted an Environmental Assessment ("EA") and a Finding of No Significant Impact ("FONSI"), concluding that an EIS was not required because the flow augmentation release would not significantly impact the quality of the human environment. In the Final EA for the 2012 flow augmentation release, BOR stated that the 1955 Act "provide[d] the principle authorization for implementing" the release. BOR ultimately released an additional 39,000 acre-feet of water in 2012.

In 2013, BOR proposed releasing an additional 62,000 acre-feet of water from the Lewiston Dam in the late summer to reduce the likelihood of a mass fish die-off in the lower Klamath River. The agency drafted an EA and a FONSI for the proposed release, again concluding that an EIS was not required. On August 6, 2013, BOR issued the Final EA and FONSI for the 2013 flow augmentation release. BOR also

concluded again in its Final EA for the 2013 flow augmentation release that the 1955 Act "provide[d] the principal authorization" for the release. Due in part to the current legal action, BOR ultimately released only 17,500 acre-feet during the 2013 flow augmentation release.

## IV.

San Luis & Delta-Mendota Water Authority is an agency comprised of local water districts in central California that hold contracts for CVP water. Westlands Water District is a member of this joint agency (collectively "the Water Contractors"). On August 7, 2013, the day following BOR's issuance of the Final EA and FONSI for the 2013 flow augmentation release, the Water Contractors filed suit against BOR, DOI, and several individuals working within these agencies ("Federal Defendants"). Two days later, the Water Contractors filed a motion for a temporary restraining order and a preliminary injunction to halt the 2013 flow augmentation release, which was scheduled to take place between August 15 and September 21, 2013. The Hoopa Valley Tribe, the Yurok Tribe, the Pacific Coast Federation of Fishermen's Association, and the Institute for Fisheries Resources promptly moved to intervene, and the district court permitted them to intervene as defendants. On August 13, 2013, the district court temporarily "enjoin[ed] the Federal Defendants from making releases from Lewiston Dam to the Trinity River in excess of 450 cubic feet per second for fishery purposes through and including August 16, 2013." However, after holding a hearing on the matter, the district court lifted this temporary restraining order and denied the motion for preliminary injunction.

The Water Contractors filed an amended complaint on October 4, 2013, alleging that Federal Defendants violated the following four statutes in implementing the 2012 and 2013 flow augmentation releases[4]: (1) the Endangered Species Act ("ESA"); (2) the National Environmental Protection Act ("NEPA"); (3) CVPIA § 3411(a) and 43 U.S.C. § 383; and (4) CVPIA § 3406(b)(23). Several months later, the parties filed cross-motions for summary judgment.

On October 1, 2014, the district court issued a Memorandum Decision resolving these motions as follows: (1) the Water Contractors lacked standing to bring their ESA claim; (2) the NEPA claim was moot; (3) the 2013 flow augmentation release did not violate CVPIA § 3411(a) or 43 U.S.C. § 383; and (4) the 2013 flow augmentation release did not violate CVPIA § 3406(b)(23) or the 2000 ROD. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 52 F. Supp. 3d 1020, 1069–70. (E.D. Cal. 2014). Accordingly, the district court granted summary judgment in favor of Federal Defendants on all four claims in the first amended complaint. *Id.* However, the district court also concluded that the 1955 Act did "not provide authorization for Federal Defendants to implement the 2013 flow augmentation release[] to benefit fish in the lower Klamath." *Id.* at 1070.

---

[4] The amended complaint purports to challenge the 2012 flow augmentation release. However, the 2012 release was largely ignored in the parties' briefing and in the district court's orders and judgment. The material facts of the 2012 and 2013 flow augmentation releases are almost identical and the omission of a discussion of the 2012 release does not alter the analysis in this case. Accordingly, this Opinion focuses on the 2013 flow augmentation release.

Federal Defendants and the Hoopa Valley and Yurok Tribes filed timely notices of appeal of the district court's ruling regarding the 1955 Act. Shortly thereafter, the Water Contractors filed a timely notice of cross-appeal of all claims except the NEPA claim.

## STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo. *San Luis & Delta-Mendota Water Auth. v. United States*, 672 F.3d 676, 699 (9th Cir. 2012). We also review de novo a "district court's interpretation and application of federal statutes" and its conclusions on a party's standing to sue. *Id.*

The Administrative Procedure Act ("APA") governs the review of a challenge to an agency's action brought under a federal statute that "contains no provision for judicial review." *Id.* (citing *United States v. Bean*, 537 U.S. 71, 77 (2002) ("[I]n the absence of a statutorily defined standard of review for [an agency's] action under [a federal statute], the APA supplies the applicable standard.")). Neither the CVPIA nor the Reclamation Act (43 U.S.C. § 383) includes such a provision. *Id.*; *Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 796 (9th Cir. 2013) ("[T]he Reclamation Act does not create a private right of action."). Thus, the APA governs our review of the Water Contractors' challenges brought under these statutes. We review de novo a district court's application of the APA standards. *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of the Navy*, 898 F.2d 1410, 1414 (9th Cir. 1990).

We first address Federal Defendants' argument that BOR had the authority to implement the 2013 flow augmentation

release under the 1955 Act.  The flow augmentation release may be set aside under the APA if it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).  We then address whether BOR violated any other statute raised by the Water Contractors. Under the APA, the panel also may set aside BOR's actions if they were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  § 706(2)(A).  Under this standard, we must consider "if the agency has articulated a rational connection between the facts found and the conclusions made."  *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1090 (9th Cir. 2005) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

## ANALYSIS

## I.  The 1955 Act

We begin our analysis by addressing whether the 1955 Act authorized BOR to release additional water from the Lewiston Dam to protect fish populations in the lower Klamath River.  It is well settled "that the starting point for interpreting a statute is the language of the statute itself." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980).

Section 2 of the 1955 Act states, in full:

> Subject to the provisions of this Act, the operation of the Trinity River division shall be integrated and coordinated, from both a financial and an operational standpoint, with the operation of other features of the Central

Valley project, as presently authorized and as may in the future be authorized by Act of Congress, in such manner as will effectuate the fullest, most beneficial, and most economic utilization of the water resources hereby made available: *Provided*, **That the Secretary is authorized and directed to adopt appropriate measures to insure the preservation and propagation of fish and wildlife, including, but not limited to, the maintenance of the flow of the Trinity River below the diversion point** at not less than one hundred and fifty cubic feet per second for the months July through November and the flow of Clear Creek below the diversion point at not less than fifteen cubic feet per second unless the Secretary and the California Fish and Game Commission determine and agree that lesser flows would be adequate for maintenance of fish life and propagation thereof; the Secretary shall also allocate to the preservation and propagation of fish and wildlife, as provided in the Act of August 14, 1946 (60 Stat. 1080), an appropriate share of the costs of constructing the Trinity River development and of operating and maintaining the same, such costs to be non-reimbursable: *Provided further*, That not less than 50,000 acre-feet shall be released annually from the Trinity Reservoir and made available to Humboldt County and downstream water users.

69 Stat. at 719–20 (bold emphasis added). We perceive no ambiguity in the language regarding the preservation and propagation mandate contained in section 2. This expansive clause, directing the Secretary to adopt any "appropriate measures," contains no limiting language, geographic or otherwise. The absence of limiting language indicates Congress intended to delegate broad authority to the Secretary, allowing the Secretary substantial discretion to determine what constitutes "appropriate measures" in the face of unforeseen or changing circumstances. *See H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 245 (1989) ("Congress' decision not explicitly to limit RICO's broad terms strongly implies that Congress had in mind no such narrow and fixed idea of what constitutes a [RICO] pattern as that suggested by *amici* here."); *John v. United States*, 247 F.3d 1032, 1043–44 (9th Cir. 2001) (en banc) (Tallman, J. concurring in judgment)(per curiam); *cf. Diamond v. Chakrabarty*, 447 U.S. 303, 316 (1980) ("Congress employed broad general language in drafting § 101 precisely because such inventions are often unforeseeable.").

Congress wanted to, and thought it could, maintain the rivers and their fish populations below the TRD while diverting substantial inflow to the Sacramento River. H.R. Rep. No. 84-602, at 4–5 (1955) ("[T]here is available for importation from the Trinity River water that is surplus to the present and future water requirements of the Trinity and Klamath River Basins."); S. Rep. No. 84-1154, at 5 (1955). Congress knew the Trinity River was the largest tributary of the Klamath and was aware that any effect on the Trinity, including water flows and water temperature, could ripple

down to the Klamath.[5]  However, Congress was not sure what these effects would be.  So, to account for unintended consequences, Congress used general language, with no geographic limitation, to empower the Secretary to take any measures it found necessary to preserve all fish and wildlife at any point downstream of the Trinity and Lewiston Dams. H.R. Rep. No. 84-602, at 4. ("[T]he [TRD] has been planned with a view to maintaining and improving fishery conditions.").  In fact, the House and Senate endorsed the 1955 Act before final studies to determine the "future water requirements in the Klamath River Basin" were completed, because it believed the "relatively small" diversion would not harm the fishery resources, and the Secretary retained the power to take measures to preserve and propagate fish and wildlife if need be.  *Id.* at 4–5; S. Rep. No. 84-1154, at 5.

Further, to avoid the ambiguities of establishing causation, Congress omitted any requirement that the threat to fish or wildlife be caused directly by the TRD.  Thus, the general language of the preservation and propagation mandate gives the Secretary wide discretion in defining "appropriate measures" and expands the statute beyond the

---

[5] *See To Authorize the Secretary of the Interior to Construct, Operate, and Maintain the Trinity River Development, Central Valley Project, California, Under Federal Reclamation Laws: Hearing on H.R. 123 Before the Subcomm. on Irrigation and Reclamation of the H. Comm. on Interior and Insular Affairs*, 83d Cong. 86 (1954) (statement of Harold Del Ponte, Supervisor, Del Norte County); *To Authorize the Secretary of the Interior to Construct, Operate, and Maintain the Trinity River Division, Central Valley Project, California, Under Federal Reclamation Laws: Hearing on H.R. 4663 Before the Subcomm. on Irrigation and Reclamation of the H. Comm. on Interior and Insular Affairs*, 84th Cong. 10 (1955) (statement of Clyde Spencer, Regional Director, Bureau of Reclamation); H.R. Rep. No. 84-602, at 4–5.

"principal evil Congress was concerned with when it" passed the 1955 Act. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79–80 (1998) (holding that Title VII, which prohibits discrimination "because of sex," covers same-sex harassment, even though that was not "the principal evil Congress was concerned with when it enacted Title VII"). Thus, even if Congress, when it enacted the 1955 Act, did not contemplate a mass fish die-off in the lower Klamath or the flow augmentation release BOR implemented to prevent it, we still must interpret the general language of the preservation and propagation mandate as authorizing the release.   BOR unquestionably implemented the flow augmentation release to protect the fish population downstream of the Lewiston Dam.  This measure, and the evil it sought to prevent, fall well within the statute's mandate. *See id.* ("[I]t is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed.").

The "including, but not limited to," language also indicates Congress's intent to provide a broad—not ambiguous—directive.  Courts have long recognized that "the term 'including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principle." *Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941) (citations omitted). Congress identified the maintenance of a minimum flow from the Lewiston Dam as one exemplary "appropriate measure" to preserve fish and wildlife downstream from the Dam. Congress expected the Secretary to adopt other measures, including water releases above the minimum flow rate, to preserve fish and wildlife when necessary, using the minimum flow rate as a guiding directive.

Our interpretation is further buttressed by the fact that the broad preservation and propagation clause is juxtaposed with other, very precise directives. For example, section 2 specifically states, "[t]hat not less than 50,000 acre-feet shall be released annually from the Trinity Reservoir and made available to Humboldt County and downstream water users." Act of Aug. 12, 1955, § 2, 69 Stat. at 720. Congress had the ability to clearly define what does and does not constitute "appropriate measures," but it did not. For over six decades thereafter, Congress has also declined to cabin or clarify this term. We presume that Congress's decision to "paint[] with a broader brush" in the preservation and propagation mandate was deliberate. *United States v. Alexander*, 725 F.3d 1117, 1121 (9th Cir. 2013) (comparing statutes in which Congress has broadly and specifically defined terms).

The Water Contractors argue that flow augmentation releases are not an "appropriate measure," because they did not serve the principal purpose of the 1955 Act—that is, to provide water for the Central Valley. This position ignores the emphasized "*Provided*," with which the preservation and propagation mandate begins. Such a proviso is intended "to except something from the enacting clause, or to qualify and restrain its generality and prevent misinterpretation." *United States v. Morrow*, 266 U.S. 531, 534 (1925); *see also Pennington v. United States*, 48 Ct. Cl. 408, 412 (Ct. Cl. 1913) (explaining that provisos "tak[e] special cases out of the general enactments and provid[e] specially for them"). Although section 2 generally requires that the TRD be operated such that the water is put to the "fullest, most beneficial, and most economic" use, the proviso specifically excepts measures to ensure the preservation and propagation of fish and wildlife. Thus, the measures to protect and

preserve wildlife need not harmonize with the 1955 Act's principal purpose.

The Water Contractors next argue that CVPIA section 3406(b)(23), and the 2000 ROD implementing its directives, finally and permanently resolved how much water should be released from the Lewiston Dam down the Trinity River.Thus, the Water Contractors argue that the CVPIA repealed or amended the 1955 Act such that "appropriate measures" to protect fish and wildlife can no longer include additional releases of water from the Lewiston Dam.

It is true that, in interpreting the 1955 Act, we must consider the related legislation that Congress subsequently enacted. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000). But, we conclude that the later legislation and administrative actions identified by the Water Contractors did not limit or repeal the 1955 Act. First, we do not hold that a statute has been repealed by a subsequent act unless Congress's intention is "clear and manifest." *Moyle v. Dir., Office of Workers' Comp. Programs*, 147 F.3d 1116, 1120 (9th Cir. 1998) (emphasis omitted) (quoting *Kee Leasing Co. v. McGahan (In re the Glacier Bay)*, 944 F.2d 577, 581 (9th Cir. 1991)). There is no indication in the 1984 Act or CVPIA section 3406(b)(23) of a "clear and manifest" intention to repeal or amend the 1955 Act.

Second, the general authority granted by the 1955 Act was not repealed or replaced by the 1984 Act or CVPIA section 3406(b)(23), because these later legislative acts implemented specific programs to address particular problems that had been brought to Congress's attention. The implementation of a specific program does not nullify an agency's pre-existing discretionary authority. Thus, the

implementation of a fish management or restoration program did not abrogate the need to continually protect fish and wildlife in the face of unforeseen harm.

Finally, the Water Contractors argue that the 2013 flow augmentation release would have been permissible if BOR had "purchased additional water to protect Central Valley uses," as BOR did in 2003 and 2004. But this argument is at direct odds with the Water Contractors' position that the 2000 ROD placed an absolute cap on the water that BOR can release down the Trinity River from the Lewiston Dam. In addition, BOR need not protect the economic interests of Central Valley water contractors when it implements measures to preserve the fish and wildlife downstream of the Lewiston Dam.

The broad language of the 1955 Act authorized BOR to implement the 2013 flow augmentation release—an appropriate measure—to protect fish downstream from the Lewiston Dam, which includes the lower Klamath River. Further, subsequent legislation did not clearly alter or limit the expansive scope of the authority granted by the 1955 Act. Thus, BOR acted within its "statutory . . . authority," 5 U.S.C. § 706(2)(C), and we must reverse the district court on this issue.

## II. CVPIA § 3406(b)(23)

We next consider whether the 2013 flow augmentation release violated CVPIA section 3406(b)(23).

Section 3406(b)(23) directed DOI to propose and adopt a permanent water release schedule for the Lewiston Dam. DOI went through the necessary procedural steps section

3406(b)(23) called for and, in the 2000 ROD, DOI established a permanent water release schedule that accounted for changes in the area's annual hydrology. The parties agree this schedule sets both a minimum and a maximum amount of water that BOR may release under the authority granted by section 3406(b)(23) and the 2000 ROD. The Water Contractors argue that this schedule sets an absolute maximum and that the 2012 and 2013 flow augmentation release impermissibly exceeded this cap.

Again, we start our analysis with the text of the CVPIA. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 56 (1987). The plain language of the statute indicates that Congress intended the permanent water release schedule to serve only the Trinity River. Section 3406(b)(23) makes multiple references to the Trinity River and does not contain any reference to the Klamath River. For example, section 3406(b)(23) established an interim "release of water to the Trinity River of not less than three hundred and forty thousand acre-feet per year," and called for a permanent schedule of "Trinity River instream fishery releases." *Id.*

In addition, the statute provides that the directives of section 3406(b)(23) were meant to "meet Federal trust responsibilities to protect the fishery resources of the Hoopa Valley Tribe, and to meet the fishery restoration goals of the Act of October 24, 1984." Congress's citation to the 1984 Act is significant. The 1984 Act, as originally adopted, called for rehabilitation of fish habitat in the "Trinity River between Lewiston Dam and Weitchpec" and "in tributaries of such river below Lewiston Dam and in the south fork of such river." § 2(a)(1)(A)–(B), 98 Stat. at 2722. Congress amended the 1984 Act in the 1996 Reauthorization Act, 110 Stat. 1338, which altered the scope of the 1984 Act's

rehabilitation mandate to include "the Klamath River downstream of the confluence with the Trinity River," § 3(b), 110 Stat. at 1339. Thus, the 1984 Act originally did not intend to cover "the Klamath River downstream of the confluence with the Trinity River." As the district court found, we conclude the reference to the specific goal of the 1984 Act was a reference to a "limited and particular provision[] of another statute," which does not incorporate subsequent amendments to that statute. *Pearce v. Dir., Office of Workers' Comp. Programs, U.S. Dep't of Labor*, 603 F.2d 763, 767 (9th Cir. 1979) (quoting *Dir., Office of Workers' Comp. Programs, U.S. Dep't of Labor v. Peabody Coal Co.*, 554 F.2d 310, 322 (7th Cir. 1977)) (explaining the difference between a "specific reference" and a "general reference"). Accordingly, the reference to the 1984 Act in the CVPIA (which was enacted in 1992) does not include the 1996 amendment. Section 3406(b)(23) of the CVPIA is thus limited to the Trinity River basin and does not cover the lower Klamath.

We also find significant section 3406(b)(23)'s reference to the Hoopa Valley Tribe—and its exclusion of all other tribes. The Hoopa Valley Reservation is within the Trinity River basin. The Yurok Tribe Reservation lies outside of the Trinity River basin, along the lower Klamath. If Congress intended the directives contained in section 3406(b)(23) to also serve the lower Klamath, it would have also listed the "Federal trust responsibilities" it owes the Yurok Tribe. *See Botosan v. Paul McNally Realty*, 216 F.3d 827, 832 (9th Cir. 2000) ("The incorporation of one statutory provision to the exclusion of another must be presumed intentional under the statutory canon of *expressio unius*.").

Thus, it is clear Congress intended section 3406(b)(23) to be geographically limited to the Trinity River basin. Any water that BOR releases from the Lewiston Dam to aid areas outside of the Trinity River basin is not subject to the permanent water release schedule called for in section 3406(b)(23) and implemented in the 2000 ROD. Because BOR intended to aid the lower Klamath River (and not the Trinity River) in implementing the 2013 flow augmentation release, the release did not violate section 3406(b)(23). Therefore, we must affirm the district court on this issue.

## III.     The Endangered Species Act Claim

Generally, "[t]o establish Article III standing, a plaintiff must demonstrate that: (1) he suffered an injury in fact that is concrete, particularized, and actual or imminent; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision." *Nat. Res. Def. Council v. Jewell*, 749 F.3d 776, 782 (9th Cir. 2014) (en banc) (citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 168 (2000)). However, this standard is softened when a plaintiff asserts a "violation of 'a procedural right.'" *Id.* at 782–83 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572 n.7 (1992)). "A showing of procedural injury lessens a plaintiff's burden on the last two prongs of the Article III standing inquiry, causation and redressibility." *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1226 (9th Cir. 2008). To establish a procedural "injury in fact, [a plaintiff] must allege . . . that (1) the [agency] violated certain procedural rules; (2) these rules protect [a plaintiff's] concrete interests; and (3) it is reasonably probable that the challenged action will threaten their concrete interests." *Nuclear Info. & Res. Serv. v. Nuclear Regulatory Comm'n*,

457 F.3d 941, 949 (9th Cir. 2006) (quoting *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004)).

The Water Contractors assert that BOR implemented the 2013 flow augmentation release without conducting a formal section 7 consultation for ESA-listed fish species.[6]   An "alleged violation[] of Section 7(a)(2)'s consultation requirement," like the Water Contractors assert, "constitute[s] a procedural injury for standing purposes." *Nat. Res. Def. Council v. Jewell*, 749 F.3d at 783 (citing *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 971 (9th Cir. 2003)).   We focus our analysis on whether the Water Contractors have shown that "it is reasonably probable that the challenged action will threaten their concrete interests." *Nuclear Info. & Res. Serv.*, 457 F.3d at 949.

The Water Contractors generally assert that BOR's failure to conduct a section 7 consultation threatens their concrete economic interest "in ensuring the continued delivery of water to their members."   More specifically, the Water Contractors allege that the 2013 flow augmentation release would reduce the total volume of water available to maintain cold water temperatures in the Sacramento River.   In support of this assertion, the Water Contractors cite one of their experts that maintains that the reduction of cold water storage "may adversely impact winter-run and/or spring run salmon egg incubation in 2013, and in 2014 if the winter of 2014 does not result in sufficient flows to refill the reservoirs,"

---

[6] "Section 7 imposes on all agencies a duty to consult with either the Fish and Wildlife Service or the [National Oceanic and Atmospheric Administration] Fisheries Service before engaging in any discretionary action that may affect a listed species or critical habitat." *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1020 (9th Cir. 2012) (en banc).

because incubating salmonid eggs can be harmed if the water temperatures exceed fifty-six degrees.[7]    The Water Contractors next assert that, if the salmonid eggs are harmed and the salmonid populations in the Sacramento River shrink, third-party agencies will place more stringent regulations on CVP operations and restrict the amount of water delivered to its members.  Finally, the Water Contractors assert such regulations and water restrictions will economically harm them because San Luis's member districts (including Westlands Water District) rely on CVP water to irrigate farms, employ farm workers, and generally maintain their communities.

The Water Contractors' posited series of events that must occur before the economic harm is realized is both too uncertain and too remote to constitute a reasonably probable threat of injury.  The Water Contractors have set forth "an attenuated chain of conjecture," *Hall v. Norton*, 266 F.3d 969, 977 (9th Cir. 2001) (quoting *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1152 (9th Cir. 2000)), that relies on a series of contingencies in weather and water temperature.  Further, the allegation that third-party agencies will eventually impose more regulations on CVP water is speculative at best.  The only evidence the Water Contractors offered in support of this assertion is the declaration of Daniel G. Nelson, San Luis & Delta-Mendota Water Authority's Executive Director, who discussed CVP regulations that were

---

[7] The Water Contractors assert that their "ability to deliver water to their members is dependent on the status and recovery of the listed species," which include coho salmon, winter- and spring-run Chinook salmon, Central Valley steelhead, green sturgeon, and Delta Smelt. The Water Contractors' expert refers primarily to "salmonids," which includes "Chinook salmon, Coho salmon and steelhead."

put in place in the 1990s.  This declaration regarding past regulations is insufficient to show a "credible threat" that third-party agencies will increase regulations on CVP water at some point in the future.  *Id.* at 976.  The Water Contractors can also only speculate as to what regulations third-party agencies might put in place.

Not only is the alleged threat to the Water Contractors' economic interests not "reasonabl[y] probabl[e]," it is also not "fairly traceable" to BOR's actions, because it "rel[ies] on conjecture about the behavior of other parties."  *Id.* at 975, 977 (quoting *Ecological Rights Found.*, 230 F.3d at 1152).  The imposition of regulations by an outside agency is an "independent action of some third party not before the court," *Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*, 733 F.3d 939, 950 (9th Cir. 2013) (quoting *Lujan*, 504 U.S. at 560), that "break[s] the causal link" between the flow augmentation release and the Water Contractors' alleged economic harm, *id.* at 953.

The district court found that the Water Contractors lacked standing to bring their ESA claim both because they failed to establish a "reasonable probability of the challenged action's threat to [their] concrete interest," 52 F. Supp. 3d at 1042 (quoting *Hall*, 266 F.3d at 977), and because section 7 was not designed to protect their asserted economic interest.  We decline to reach the latter issue.  Instead, the Water Contractors have failed to establish standing, because they have not demonstrated a reasonable probability that the alleged failure to conduct a section 7 consultation will threaten their economic interests.

**IV.    The Reclamation Act (43 U.S.C. § 383) and CVPIA § 3411(a)**

Finally, we address whether BOR violated the Reclamation Act, 43 U.S.C. § 383, or section 3411(a) of the CVPIA by implementing the 2013 flow augmentation release without first obtaining a modification in its water rights permits.

*A.  The Reclamation Act*

Under the Reclamation Act of 1902, BOR must comply with state water law in "control[ling], appropriat[ing], us[ing], or distribut[ing]" water,  43 U.S.C. § 383; *see also Westlands Water Dist. v. United States*, 337 F.3d 1092, 1101 (9th Cir. 2003), unless the state law is "directly inconsistent with . . . a preemptive federal statute," *Nat. Res. Def. Council v. Houston*, 146 F.3d 1118, 1132 (9th Cir. 1998).  California law provides that "[t]he issuance of a permit gives the right to take and use water only to the extent and for the purpose allowed in the permit."  Cal. Water Code § 1381.  Further, a water rights permit holder may only "change the point of diversion, place of use, or purpose of use from that specified in the . . . permit . . . upon permission of the [State Water Resources Control Board]."  *Id.* § 1701.

BOR has several water rights permits it obtained from the state of California in the 1950s to divert water from the Trinity River at Lewiston Dam to the CVP.  The Water Contractors argue that BOR did not comply with California law when it implemented the 2013 flow augmentation release, because these water rights permits did not list the lower Klamath River as "an approved place of use," and BOR

did not obtain permission from the State Water Resources Control Board to change the place of use of the permits.

California Fish & Game Code section 5937 creates an exception to the permit change requirement. This code section provides:

> The owner of any dam shall allow sufficient water at all times to pass through a fishway, or in the absence of a fishway, allow sufficient water to pass over, around or through the dam, to keep in good condition any fish that may be planted or exist below the dam.

Cal. Fish & Game Code § 5937. This code section not only allows, but requires BOR to allow sufficient water to pass the Lewiston Dam to maintain the fish below the Dam. The use of the unconditional "shall" indicates that such required releases are not dependent on having a proper water permit. Although the lower Klamath River is many miles downstream of the Lewiston Dam, it is still "below the dam." Therefore, section 5937 permitted BOR to release water from the Lewiston Dam to "keep in good condition" the fish in the lower Klamath River without changing its water rights permits. Significantly, the California Department of Fish and Wildlife has submitted an amicus brief asserting that section 5937 authorized the 2013 flow augmentation release. Accordingly, BOR neither violated California water law nor the Reclamation Act in implementing the 2013 flow augmentation release.

*B.   CVPIA § 3411(a).*

Section 3411(a) of the CVPIA provides:

> [T]he Secretary shall, prior to the reallocation of water from any purpose of use or place of use specified within applicable Central Valley Project water rights permits and licenses to a purpose of use or place of use not specified within said permits or licenses, obtain a modification in those permits and licenses, in a manner consistent with the provisions of applicable State law, to allow such change in purpose of use or place of use.

The Water Contractors assert that BOR violated this provision because it failed to obtain permission from the State Water Resources Control Board to modify its water permits before implementing the 2013 flow augmentation release. The Water Contractors also assert that this section of the CVPIA places a duty on BOR, independent of state law, to obtain a change in the water rights permits.

We have previously concluded that "section 3411(a) restates the requirements of California water law." *Westlands Water Dist. v. Nat. Res. Defense Council*, 43 F.3d 457, 461 (9th Cir. 1994). Indeed, section 3411(a) clearly provides that any modification must be "consistent with the provisions of applicable State law." Accordingly, we reaffirm our holding that section 3411(a) does not impose on BOR a duty to obtain a permit modification that is independent of the duty created by state law. As explained above, California Fish & Game Code section 5937 creates an exception to the general rule that water permit holders must obtain permission to modify

their permits before altering the place or purpose of the water use listed on their permits. Because the 2013 flow augmentation release fell under the section 5937 exception, BOR did not violate California law, and thus did not violate CVPIA section 3411(a).

## CONCLUSION

The broad language of the 1955 Act gave BOR the authority to implement the 2013 flow augmentation release to protect fish in the lower Klamath River. Because the 2013 flow augmentation release sought to protect fish in the lower Klamath River, it did not violate CVPIA section 3406(b)(23), which called for a permanent water release schedule that would serve only the Trinity River basin. The 2013 flow augmentation release also did not violate California water law and, in turn, did not violate the Reclamation Act or CVPIA section 3411(a), both of which require BOR to comply with state water permitting requirements. Finally, we do not reach the merits of the ESA claim, as the Water Contractors do not have standing to pursue this claim.

The parties shall bear their own costs on appeal. The judgment of the district court is **AFFIRMED IN PART and REVERSED IN PART.**